IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SUNSTONE ENGINEERING, LLC,<br><br>Plaintiff,<br><br>v.<br><br>PURE TECHNOLOGY CONSULTING, LLC; and EXODUS TRADING GROUP, LLC,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:26-cv-00618<br><br>District Judge Robert J. Shelby<br><br>Magistrate Judge Jared C. Bennett |

The parties in this case are competing companies in the permanent jewelry industry. Pending before the court is Defendant Exodus Trading Group, LLC's Motion to Dismiss for Lack of Personal Jurisdiction.[1] For the reasons explained below, the court GRANTS the Motion.

[1] Dkt. 16, *Defendant Exodus Trading Group, LLC's Motion to Dismiss for Lack of Personal Jurisdiction* (*Motion*). Also pending before the court is Plaintiff Sunstone Engineering, LLC's Motion to Dismiss Defendant Pure Technology Consulting, LLC (PTC)'s Counterclaims for failure to state a claim for relief. Dkt. 20, *Plaintiff and Counterclaim Defendant Sunstone Engineering, LLC's Motion to Dismiss Counterclaims and Memorandum in Support* (*Sunstone Motion*). This Order does not resolve the Sunstone Motion.

## FACTUAL ALLEGATIONS[2]

Plaintiff Sunstone Engineering, LLC is a Utah limited liability company that manufacturers micro-welders, including welders for the permanent jewelry industry.[3] A substantial portion of the permanent jewelry industry uses Sunstone's products, services, and supply chain.[4] In February 2024, Sunstone's Director of Business Development Tony Price began designing an integrated software application to operate alongside Sunstone's hardware.[5] By the end of 2025, Sunstone committed to developing the software which it now markets as Sunstone Studio, "a multi-tenant software-as-a-service tailored to the permanent-jewelry industry, integrated with Sunstone's welders, gift-card and warranty systems, supply chain, and customer base."[6]

In November 2025, Price was introduced via email to Wesam Said, a representative of Exodus.[7] Exodus is a Florida limited liability company.[8] On November 18, 2025, Wesam and

[2] At the motion to dismiss stage, the court "accept[s] as true the well-pleaded (that is, plausible, non-conclusory, and non-speculative) facts alleged in the complaint, unless they are controverted by sworn statements." *XMission, L.C. v. Fluent LLC*, 955 F.3d 833, 836 (10th Cir. 2020) (citation modified). The court may also consider sworn statements attached to the motion and memorandum in opposition to the motion to determine its jurisdiction. *See Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). But the court will generally not consider new arguments or evidence cited for the first time in reply. *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1119 (10th Cir. 2015). Accordingly, the following facts are drawn from the Complaint and the declaration Sunstone attached to the Opposition. *See* Dkt. 1-1, *Exhibit A* (*Complaint*); Dkt. 22-1, *Declaration of Tony Price in Support of Plaintiff's Opposition to Defendant Exodus Trading Group, LLC's Motion to Dismiss for Lack of Personal Jurisdiction* (*Price Declaration*). The court will not consider the declaration attached to Exodus's memorandum in reply. *See* Dkt. 25-1, *Declaration of Wesam Said in Support of Exodus Trading Group, LLC's Motion to Dismiss for Lack of Personal Jurisdiction*.

[3] *Complaint* ¶¶ 2, 7.

[4] *Id.* ¶ 16.

[5] *Id.* ¶¶ 3, 17.

[6] *Id.* ¶ 20.

[7] *Id.* ¶ 9; *Price Declaration* ¶¶ 4, 12–13. The Complaint refers to Wesam Said and Amin Said. *Complaint* ¶¶ 8–9. For clarity, this Order refers to them individually by their first name.

[8] *Complaint* ¶ 9.

Price had a phone call to explore opportunities to work together.[9] Between November and December 2025, Wesam emailed Price nine times.[10] In these communications, Sunstone requested a quote for twenty products that would complement Sunstone's inventory, which Wesam provided on November 20, 2025.[11]

In late December 2025, Price learned about ChainHQ, Defendants' software product.[12] Price contacted Wesam to discuss the software, and Wesam set up a virtual call between PTC, Exodus, and Sunstone.[13] On January 9, 2026, Price participated in a call with Sam, Exodus's representative, and Amin Said, PTC's representative.[14] During the call, Amin presented a screen-share demonstration of ChainHQ, including its administrative and management screens.[15]

On January 13, 2026, PTC, Sunstone, and Exodus entered into a non-disclosure agreement (NDA).[16] The NDA's stated purpose was to facilitate "discussions and review [of] proprietary information related to a software application and related technologies (the 'App') for the purpose of evaluating a potential white-label partnership, licensing arrangement, acquisition, or other business relationship."[17] The NDA is governed by South Carolina law.[18]

---

[9] *Price Declaration* ¶ 4.

[10] *Id.*; *see also* Dkt. 22-1, *Exhibit 1* (*Price-Wesam Email Chain*). Wesam is also referred to as Sam throughout the briefs and exhibits. *See Price Declaration* ¶ 3.

[11] *Price-Wesam Email Chain* at 8–9.

[12] *Price Declaration* ¶ 6.

[13] *Id.*

[14] *Id.* ¶ 7; *Complaint* ¶ 26.

[15] *Price Declaration* ¶ 7; *Complaint* ¶¶ 26, 28.

[16] *Complaint* ¶¶ 21–22; Dkt. 22-1, *Price Declaration*, *Exhibit 2* (*NDA*).

[17] *Complaint* ¶ 22; *NDA* § 1.

[18] *Complaint* ¶ 25; *NDA* § 9.

On January 21, 2026, after signing the NDA, Wesam emailed Sunstone employees to follow up on the chain-supply discussion.[19] Sunstone ultimately declined to purchase or license ChainHQ and elected to continue developing Sunstone Studio.[20]

After another individual in the permanent jewelry industry accused Sunstone Studio of copying ChainHQ,[21] Sunstone initiated this case in Utah state court seeking declaratory relief that Sunstone had not breached the NDA or misappropriated any trade secret.[22]

## PROCEDURAL HISTORY

On May 29, 2026, Sunstone filed its Complaint in Utah state court bringing six claims for breach of contract and violations of South Carolina and Utah state statutes that protect trade secrets.[23] After removing the case to this court on July 2, 2026,[24] Exodus filed its Motion seeking dismissal for lack of personal jurisdiction on July 9, 2026.[25] The Motion is fully briefed and ripe for review.[26]

## LEGAL STANDARD

The Motion seeks dismissal for "lack of personal jurisdiction" under Federal Rule of Civil Procedure 12(b)(2).[27] The "plaintiff bears the burden of establishing personal jurisdiction

[19] *Price Declaration* ¶ 14.

[20] *Complaint* ¶ 31.

[21] *See id.* ¶¶ 35–36.

[22] *Id.*; *id.* at 23–24.

[23] *Id.* ¶¶ 38–83.

[24] Dkt. 1, *Notice of Removal*. PTC consented to removal. *Id.* ¶ 20.

[25] *Motion*.

[26] Dkt. 22, *Plaintiff's Memorandum in Opposition to Defendant Exodus Trading Group, LLC's Motion to Dismiss for Lack of Personal Jurisdiction* (*Opposition*); Dkt. 25, *Defendant Exodus Trading Group, LLC's Reply in Support of its Motion to Dismiss for Lack of Personal Jurisdiction* (*Reply*).

[27] *See Motion*; Fed. R. Civ. P. 12(b)(2).

over the defendant."[28] At the motion to dismiss phase, the plaintiff need only make a prima facie showing.[29] The plaintiff makes such a showing by "presenting evidence (either uncontested allegations in its complaint or other materials, or an affidavit or declaration) 'that if true would support jurisdiction over the defendant.'"[30] "If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."[31]

**ANALYSIS**

Exodus argues this court lacks personal jurisdiction over it.[32] This court has personal jurisdiction over an out-of-state defendant if (1) Utah's long-arm statute authorizes service of process on the defendant and (2) exercise of jurisdiction comports with federal constitutional due process.[33] Utah's long-arm statute is coextensive with the federal due process clause.[34] Under Utah law, the two-step inquiry collapses into the federal due process analysis.[35]

The federal Due Process Clause "constrains a State's authority to bind a nonresident defendant to a judgment of its courts."[36] Exercising personal jurisdiction comports with federal due process if (1) the out-of-state defendant has "minimum contacts" with the state of Utah such that (2) "having to defend a lawsuit there would not 'offend traditional notions of fair play and

---

[28] *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998) (citation modified).

[29] *Behagen v. Amateur Basketball Ass'n of U.S.A.*, 744 F.2d 731, 733 (10th Cir. 1984).

[30] *XMission*, 955 F.3d at 839 (quoting *OMI Holdings*, 149 F.3d at 1091).

[31] *Behagen*, 744 F.2d at 733.

[32] *Motion*.

[33] *XMission*, 955 F.3d at 839.

[34] Utah Code § 78B-3-201(3) (West 2008); *see also Fenn v. Mleads Enters., Inc.*, 137 P.3d 706, 710 n.10 (Utah 2006) (stating Utah's long-arm statute "hinges on whether due process permits the exercise of jurisdiction").

[35] *Rusakiewicz v. Lowe*, 556 F.3d 1095, 1100 (10th Cir. 2009).

[36] *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (citation omitted).

substantial justice'"[37] The minimum contacts prong may be met through general jurisdiction or specific jurisdiction.[38] Specific jurisdiction is at issue here.[39] Specific jurisdiction exists "if (1) the out-of-state defendant 'purposefully directed' its activities at residents of the forum State, and (2) the plaintiff's alleged injuries 'arise out of or relate to those activities.'"[40] When there are multiple defendants, the court must assess personal jurisdiction as to each defendant individually.[41]

The first step is purposeful direction,[42] which requires "that a defendant have deliberately engaged in significant activities within the forum State or deliberately directed its activities at the forum State, so that it has manifestly availed itself of the privilege of conducting business there."[43] This requirement "ensures that a defendant will not be subject to the laws of a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, the unilateral activity of another party or a third person, or the mere foreseeability that its actions may cause injury in that jurisdiction."[44] The Tenth Circuit has articulated "three frameworks for determining whether an out-of-state defendant's activities satisfy the purposeful direction requirement: (1) continuing relationships with forum state residents ('continuing relationships'); (2) deliberate exploitation of the forum state market ('market exploitation'); and (3) harmful effects in the forum state

---

[37] *Dudnikov*, 514 F.3d at 1070 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

[38] *XMission*, 955 F.3d at 840.

[39] General jurisdiction exists if a person's "contacts with the State are so 'continuous and systematic' that the person is essentially at home in the State." *Id.* (quoting *Old Republic Ins. Co. v. Cont'l Motors, Inc.*, 877 F.3d 895, 904 (10th Cir. 2017)). No party argues Utah has general jurisdiction over Icon Direct. *See Motion*; *Opposition* at 12.

[40] *XMission*, 955 F.3d at 840 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *see also OMI Holdings*, 149 F.3d at 1091.

[41] *See Rush v. Savchuk*, 444 U.S. 320, 332 (1980).

[42] Purposeful direction is "sometimes referred to as purposeful availment." *XMission*, 955 F.3d at 840.

[43] *Id.* (citation modified).

[44] *Id.* at 840–41 (citation modified).

('harmful effects')."[45] Considering each framework in turn, the court concludes it lacks jurisdiction over Exodus.

## I. Continuing Relationships

Sunstone first argues purposeful direction is met using the continuing relationships framework.[46] Under this framework, the court has "jurisdiction over defendants who have purposefully 'reached out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State."[47] "But the plaintiff cannot be the only link between the defendant and the forum."[48] Rather, in determining purposeful availment, the court must "evaluate the parties' prior negotiations and contemplated future consequences, the terms of the contract, the parties' actual course of dealing, and the defendant's solicitations of or direct communications with forum state residents."[49]

Here, Exodus entered into the NDA with a Utah-based company, but the contract did not envision continuing or wide-reaching contacts with Utah.[50] The contract itself shows the parties' relationship was limited and untied to Utah. The NDA's purpose was to facilitate "discussions and review proprietary information related to" ChainHQ "for the purpose of evaluating a potential white-label partnership, licensing agreement, acquisition, or other business relationship."[51] The contract contemplates a singular, limited contact with Sunstone: deciding

---

[45] *Old Republic*, 877 F.3d at 905.

[46] *Opposition* at 14–18.

[47] *Old Republic*, 877 F.3d at 905 (quoting *Walden*, 571 U.S. at 285).

[48] *Walden*, 571 U.S. at 286.

[49] *Old Republic*, 877 F.3d at 905 (citation modified).

[50] *See Walden*, 571 U.S. at 285.

[51] *NDA* § 1.

whether to enter into a future contract. While that future, hypothetical contract might have contemplated a sufficiently enduring partnership or agreement to warrant personal jurisdiction, Exodus never entered into such a contract.[52] The NDA that Exodus did enter included no future consequences beyond a discussion with Sunstone.[53] Additionally, South Carolina law governs the contract—not Utah law.[54] The parties' engagement with each other further shows there was no availment here: Exodus sent less than ten emails, had one phone call, and one virtual meeting with Sunstone representatives.[55] After the contract was signed, Exodus sent only one more communication to Sunstone about the contract.[56] These contacts with a Utah-based company are few and every communication was remote. Utah is only relevant because Sunstone is based here. But this court lacks jurisdiction when the only link between Exodus and Utah is Sunstone.[57] Accordingly, the court concludes Sunstone fails to establish purposeful direction under the continuing relationships test.

### II. Market Exploitation

Sunstone next argues purposeful direction is met using the market exploitation framework.[58] Under this framework, the court determines whether the out-of-state defendant continuously and deliberately exploited the forum state market.[59] The Tenth Circuit has outlined

---

[52] *Complaint* ¶¶ 26–30 (stating that Sunstone declined to pursue any further transaction with Exodus after the demonstration in 2026 and follow-up email); *see also Price Declaration* ¶ 14.

[53] *See NDA*.

[54] *Id.* § 9.

[55] *Price Declaration* ¶¶ 3–11; *Price-Wesam Email Chain*.

[56] *See Price Declaration* ¶ 14.

[57] *See Walden*, 571 U.S. at 286.

[58] *Opposition* at 18–19.

[59] *Old Republic*, 877 F.3d at 905–06 (citing *Keeton v. Hustler Magazine*, 465 U.S. 770, 781 (1984)) (citation modified).

two factors for this court to consider: (1) "high sales volume and large customer base and revenues" and (2) "extensive nationwide advertising or ads targeting the forum state."[60]

The first factor of the market exploitation test is whether Exodus benefits from "high sales volume and large customer base and revenues" from Utah.[61] In *Keeton v. Hustler Magazine*,[62] the Supreme Court created the market exploitation framework when it held an out-of-state publisher purposefully directed its activities at the forum state by selling "10 to 15,000 copies of its magazine in the forum state each month."[63] In *uBID v. GoDaddy Group, Inc.*,[64] the Seventh Circuit held GoDaddy.com satisfied the market exploitation test because the "domain name registration site" had "hundreds of thousands of customers in the [forum] state" and earned "millions of dollars in revenue from the state each year."[65] In *Old Republic Insurance Co. v. Continental Motors, Inc.*,[66] the Tenth Circuit relied on the *GoDaddy* analysis to hold an airplane engine manufacturer did not purposefully direct its activities at the forum state because the defendant sold access to its online service manuals to only twenty forum-based airplane repair companies for less than $20,000 each year.[67] The Circuit concluded this was insufficiently extensive "sales, revenues, or advertising . . . to support jurisdiction over [the defendant] under the *Keeton* market exploitation framework."[68]

---

[60] *Id.* at 915 (citing *Keeton*, 465 U.S. at 781).

[61] *Id.*

[62] 465 U.S. 770 (1984).

[63] *Old Republic*, 877 F.3d at 915 (citing *Keeton*, 465 U.S. at 772) (citation modified).

[64] 623 F.3d 421 (7th Cir. 2010).

[65] *Id.* at 423, 432–33; *see also Old Republic*, 877 F.3d at 915–16 (citing *GoDaddy*, 623 F.3d at 432–33).

[66] 877 F.3d 895 (10th Cir. 2017).

[67] *Id.* at 901, 915.

[68] *Id.* at 915.

The second factor of the market exploitation test is whether Exodus engages in "extensive nationwide advertising or ads targeting" Utah.[69] In *GoDaddy*, the Seventh Circuit found jurisdiction based on GoDaddy's "extensive national advertising campaign" consisting of "many television advertisements on national networks and extensive venue advertising and celebrity and sports sponsorships."[70] Conversely, in *Old Republic*, the airplane engine manufacturer operated its website, which was its only marketing platform.[71] Distinguishing the case from *GoDaddy*, the Tenth Circuit explained that, unlike GoDaddy, the manufacturer did not "launch[] national television commercials, place[] physical advertisements in [forum state] venues, or obtain[] celebrity sponsorships" or maintain "geographically-restricted online ads."[72] Accordingly, the Tenth Circuit concluded the court lacked jurisdiction under the market exploitation test.[73]

Here, Sunstone fails to show either factor weighs in favor of jurisdiction. Sunstone argues, "Eleven solicitations into Utah, a priced quote for twenty products, and a return to that [forum-based] business after the agreement are the continuous and deliberate market exploitation *Old Republic* describes."[74] But there is no evidence in the record of Exodus having any customers in Utah or receiving any revenue from Utah—much less a "high sales volume" here.[75] Further, there is also no evidence of nationwide or Utah-targeted advertising. In *GoDaddy*, the Seventh Circuit found the Defendant advertisements to hundreds of millions of people during

---

[69] *Id.* (citing *Keeton*, 465 U.S. at 781).

[70] *Old Republic*, 877 F.3d at 916 (quoting *GoDaddy*, 623 F.3d at 427, 429) (citation modified).

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *Opposition* at 19 (relying on the Price Declaration).

[75] *Old Republic*, 877 F.3d at 915–16.

"six straight years of Super Bowl ads" sufficiently extensive.[76] No comparable advertising exists here. Accordingly, the court concludes Sunstone fails to make a prima facie showing under the market exploitation test.

### III. Harmful Effects

Finally, Sunstone argues purposeful direction is met using the harmful effects framework.[77] Under this framwork, a plaintiff may establish purposeful direction by showing the "out-of-state defendant's *intentional* conduct targets and has substantial harmful effects in the forum state."[78] The test has three elements: (1) the defendant acted intentionally, (2) that action was "expressly aimed at the forum state," and (3) the defendant knew "the brunt of the injury would be felt in the forum state."[79]

In *Calder v. Jones*,[80] a California resident brought a libel suit in California against a reporter and editor from Florida.[81] The Supreme Court found purposeful direction was satisfied because California was "the focal point of the story and of the harm suffered."[82] The Supreme Court later clarified purposeful direction was met in *Calder* because the defendants there contacted "'California sources' for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State; and the 'brunt' of that injury

---

[76] *GoDaddy*, 623 F.3d at 427.

[77] *Opposition* at 20–24.

[78] *Old Republic*, 877 F.3d at 907 (emphasis in original).

[79] *Id.* (quoting *Dudnikov*, 514 F.3d at 1072).

[80] 465 U.S. 783 (1984).

[81] *Id.* at 788–89.

[82] *Id.* at 789.

was suffered by the plaintiff in" California.[83] The Court concluded, "[j]urisdiction over the defendants was therefore proper in California based on the 'effects' of their Florida conduct in California."[84]

In *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*,[85] a copyright holder contacted the online retailer eBay to suspend the auction of fabrics that the rights-holder believed infringed their copyright.[86] Thereafter, the seller of the fabric brought suit in Colorado, where the seller was based, seeking a declaratory judgment that the prints did not infringe the defendants' copyrights.[87] The Circuit held Colorado had personal jurisdiction over the non-forum defendants because (1) the defendants intentionally acted by contacting eBay to terminate plaintiffs' online auction, (2) that action was aimed at the forum since the plaintiff's eBay auction page stated the plaintiffs' business was located in Colorado, and (3) the defendants knew the brunt of the injury would be felt where the plaintiffs were located—Colorado.[88] The defendants argued Colorado was not the focal point of contacting eBay because eBay is located in California, but the Circuit rejected this argument because Defendants knew the plaintiffs' business was in Colorado and the purpose of contacting eBay was to terminate the plaintiffs' Colorado auction.[89]

Here, Exodus intentionally acted by entering the NDA with Sunstone, but Utah is not the focal point of that action. Contracting with a Utah company is not sufficient to warrant personal

---

[83] *Walden*, 571 U.S. at 287.

[84] *Id.*

[85] 514 F.3d 1063 (10th Cir. 2008).

[86] *Id.* at 1067.

[87] *Id.* at 1067–68.

[88] *Id.* at 1073–77.

[89] *Id.*

jurisdiction even if Exodus knew the other party was based in Utah.[90] And for the reasons explained above, the contract itself was not tied to Utah.[91] Accordingly, the court concludes Sunstone fails to satisfy the harmful effects test.

Regardless of the framework used, Sunstone fails to make a prima facie showing that Exodus purposefully directed its actions at Utah. The court need not address the remaining personal jurisdiction elements.[92] Utah lacks personal jurisdiction over Exodus.

## CONCLUSION

For the reasons explained above, the Motion is GRANTED.[93] Exodus is DISMISSED for lack of personal jurisdiction.

SO ORDERED this 30th day of September, 2026.

BY THE COURT:

ROBERT J. SHELBY
United States District Judge

[90] *See Benton v. Cameco Corp.*, 375 F.3d 1070, 1077 (10th Cir. 2004) ("A contract between an out-of-state party and a resident of the forum state cannot, standing alone, establish sufficient minimum contacts with the forum.").

[91] *See supra* Section I.

[92] Two personal jurisdiction elements remain: (1) whether Sunstone's injuries arise out of or relate to Exodus's Utah-based activities, and (2) whether having Exodus defend a lawsuit here would offend traditional notions of fair play and substantial justice. *See XMission*, 955 F.3d at 840.

[93] Dkt. 16.